## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**In the Matter of the Search of**
**25 Laurel Street, Greenfield,**
**Massachusetts**

Case No.  19 mj 3112 (KAR)

### AFFIDAVIT FOR SEARCH WARRANT

I, Joseph K. McCulley, Special Agent with the Food and Drug Administration Office of

Criminal Investigations, being duly sworn, hereby depose and state:

### *INTRODUCTION AND AGENT BACKGROUND*

1.      I am a Special Agent with the Food and Drug Administration – Office of Criminal

Investigations (FDA-OCI) and have been since October of 2010.  As a Special Agent with FDA-

OCI, I am responsible for conducting criminal investigations involving violations of the Federal

Food Drug and Cosmetic Act under Title 21 and related violations of Title 18 of the United

States Code.  I have experience investigating counterfeit, misbranded and unapproved

prescription drugs.  I have completed FDA-OCI's Special Agent Training Program (2010) as

well as specialized legal training related to the Food Drug and Cosmetic Act.  Prior to my current

assignment, I was a Special Agent with the United States Secret Service for 7 years.  I have

successfully completed the Criminal Investigator Training Program at the Federal Law

Enforcement Training Center (2004) and the Secret Service Special Agent Training Program in

Beltsville, Maryland (2004).  In addition, I have completed specialized training related to

electronic and computer crimes (2009).  During my career as a federal investigator, I have

conducted criminal investigations for violations of various State and Federal law to include

misbranded drugs and devices, counterfeit drugs, wire fraud, mail fraud and the manufacture of

counterfeit U.S. currency.

2.      Based on the above training and experience, I am well-versed regarding the means and methods used by persons involved in the manufacture and sale of counterfeit, misbranded and unapproved prescription drugs, as well as money laundering, the motivation of such persons involved in these crimes, and the methods utilized to facilitate the manufacture and sale of controlled substances.

### *PURPOSE OF AFFIDAVIT*

3.      I am currently investigating ANTHONY STOKES ("STOKES"), JEREMIAH MCLENITHAN ("MCLENITHAN"), MELISSA ABBOTT ("ABBOTT"), and others (collectively, the "TARGET SUBJECTS") concerning violations of federal law, including (a) distribution of adulterated and misbranded drugs in violation of 21 U.S.C. § 331(a), (b) possessing a thing to render a drug a counterfeit drug, in violation of 21 U.S.C. § 331(i)(2), (c) distribution of counterfeit drugs, in violation of 21 U.S.C. § 331(i)(3), (d) distribution and possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), (e) dispensing controlled substance via the Internet, in violation of 21 U.S.C. § 841(h)(1)(A), (f) unlawful use of a communication facility (including the mails) to facilitate the distribution of a controlled substance, in violation of 21 U.S.C. § 843(b), (g) conspiracy to distribute a controlled substance, in violation of 21 U.S.C. § 846, and (h) money laundering in violation of 18 U.S.C. § 1956 (collectively, the "SUBJECT OFFENSES").

4.      I am submitting this affidavit to obtain a warrant to search the following, pursuant to Rule 41 of the Federal Rules of Criminal Procedure:

a.      The premises at which MCLENITHAN resides, located at 25 Laurel Street, Greenfield, MA 01301 (the "SUBJECT PREMISES"), as described in greater detail in Attachment A.

There is probable cause to believe that the SUBJECT PREMISES contains evidence, fruits, and instrumentalities of the SUBJECT OFFENSES listed above, as described in Attachment B.

5.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested search warrant and does not set forth all of my knowledge about this matter. All dates and times are approximate, and all conversations or information obtained are reported in sum and substance and not verbatim.

### *THE FEDERAL FOOD, DRUG, AND COSMETIC ACT*

6.      The FDA is the federal agency charged with the responsibility of protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. §§ 301-399i.  One of the purposes of the FDCA is to ensure that drugs sold for human use are safe and effective and bear labeling that contains true and accurate information.

7.      The FDCA defines a "drug" as:

(A)   articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them;

(B)   articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals;

(C)   articles (other than food) intended to affect the structure or any function of the body of man or other animals; and

(D)   articles intended for use as a component of any articles specified above.

21 U.S.C. § 321(g)(1).

8.      Prescription drugs are drugs that, because of their toxicity and other potential for harmful effects, or the method of their use, or the collateral measures necessary to their use, are

3

not safe for use except under the supervision of a practitioner licensed by law to administer such drugs. 21 U.S.C. § 353(b)(1)(A).  A drug is also a prescription drug if the FDA requires it to be administered under the supervision of a practitioner licensed by law to administer such drug as a condition of the FDA's approval of the drug.  21 U.S.C. § 353(b)(1)(B).

9.      The act of dispensing a prescription drug without a valid prescription from a practitioner licensed by law to administer such a drug is an act that results in the drug being misbranded while held for sale.  21 U.S.C. § 353(b)(1).

10.      A drug is also misbranded if:

- Its labeling is false or misleading in any particular. 21 U.S.C. § 352(a).

- Its labeling fails to bear adequate directions for use. 21 U.S.C. § 352(f)(1).

- Its labeling fails to bear adequate warnings.  21 U.S.C. § 352(f)(2).

"Adequate directions for use" means directions under which a layperson can use a drug safely and for the purposes for which it is intended.  21 C.F.R. § 201.5.  Prescription drugs, by definition, lack adequate directions for use by a layperson and are presumptively misbranded. See *United States v. Regenerative Sciences*, LLC, 741 F.3d 1314, 1324 (D.C. Cir. 2014); *United States v. Articles of Drug*, 625 F.2d 665, 673, 675 (5th Cir. 1980).

11. A drug is adulterated if:

-  It purports to be or is represented as a drug the name of which is recognized in an official compendium – such as the United States Pharmacopeia (USP) – and its strength differs from, or its quality or purity falls below, the standards set forth in such compendium.  21 U.S.C. § 351(b).

- Any substance has been substituted wholly or in part therefor.  21 U.S.C. § 351(d)(2).

12.     The FDCA requires drug products in solid oral dosage form to be clearly marked or imprinted with a code imprint that, in conjunction with the product's size, shape, and color, permits the unique identification of the drug product and the manufacturer or distributor of the product.  Identification of the drug product requires identification of its active ingredients and its dosage strength.  Inclusion of a letter or number in the imprint, while not required, is encouraged as a more effective means of identification than a symbol or logo by itself.  Code imprint means any single letter or number or any combination of letters and numbers, including, e.g., words, company name, and National Drug Code, or a mark, symbol, logo, or monogram, or a combination of letters, numbers, and marks or symbols, assigned by a drug firm to a specific drug product.  21 C.F.R. § 206.10.

13.     The term "counterfeit drug" means a drug which, without authorization, bears the trademark, trade name, or other identifying mark, imprint, or device, or any likeness thereof, of a drug manufacturer, processor, packer, or distributor other than the person or persons who in fact manufactured, processed, packed, or distributed such drug and which thereby falsely purports or is represented to be the product of, or to have been packed or distributed by, such other drug manufacturer, processor, packer, or distributor.  21 U.S.C. § 321(g)(2).

14.     The FDCA prohibits doing or causing the following:

- introducing or delivering for introduction into interstate commerce any drug that is adulterated or misbranded.  21 U.S.C. § 331(a).

- making, selling, or keeping in possession, custody, or control of any punch, die, plate, stone, or other thing designed to imprint, or reproduce the trademark, or other identifying mark, imprint, or device of another or any likeness of any of the foregoing upon any drug so as to render such drug a

5

counterfeit drug.  See 21 U.S.C § 331(i)(2).Selling or dispensing, or the

holding for sale or dispensing of, a counterfeit drug.  21 U.S.C. § 331(i)(3).

15.     The FDCA imposes strict-liability misdemeanor punishment for violations of

Title 21, United States Code, Section 331.  21 U.S.C. § 333(a)(1); *United States v. Park*, 421

U.S. 658 (1975).  The FDCA imposes felony punishment of up to 3 years of imprisonment

and/or a fine for conduct committed with an "intent to defraud or mislead" either consumers or

government regulators.  21 U.S.C. § 333(a)(2).

16.     Notwithstanding the penalties in Section 333(a):

any person who knowingly and intentionally adulterates a drug within the
meaning of Section 351(b) or (d) and such drug has a reasonable probability of
causing serious adverse health consequences or death, shall be imprisoned for not
more than 20 years and/or fined.

21 U.S.C. § 333(b)(7).

17.     Any person who violates section 331(i)(3) by knowingly making, selling, or

dispensing, or holding for sale or dispensing, a counterfeit drug shall be imprisoned for not more

than 10 years and/or fined.  21 U.S.C. § 333(b)(8).

### *OXYCODONE AND FENTANYL*

18.     Oxycodone is a Schedule II Controlled Substance under the Controlled

Substances Act, and it is the active ingredient in several FDA-approved prescription drugs,

including oxycodone hydrochloride tablets manufactured by Mallinckrodt, Inc. and oxycodone

hydrochloride tablets manufactured by Actavis Elizabeth LLC.  The Mallinckrodt and Actavis

oxycodone hydrochloride tablets are opioid agonists indicated for the of pain severe enough to

require an opioid analgesic and for which alternative treatments are inadequate.  The FDA-

approved labeling for these products contains a "boxed warning" (sometimes referred to as a

"black box warning") under 21 C.F.R. § 201.57(c)(1), which is FDA's most prominent warning,

6

cautioning about, among things, addiction, abuse, and life-threatening respiratory depression associated with oxycodone hydrochloride.

19.    Mallinckrodt's FDA-approved oxycodone tablets that contain 30 mg of oxycodone hydrochloride USP per tablet are blue in color and are imprinted with "" on one side and "30" on top of a line on the other side.

20.    Actavis' FDA-approved oxycodone tablets that contain 30 mg of oxycodone hydrochloride USP per tablet are blue and are imprinted with "A" on the top side of a line and "215" on the bottom side of the line.

21.    FDA has approved at least one prescription drug tablet whose active ingredient is fentanyl, Abstral.  Fentanyl is a Schedule II Controlled Substance under the Controlled Substances Act.  Abstral is indicated for the indicated for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving, and who are tolerant to, around-the-clock opioid therapy for their underlying persistent cancer pain.  The FDA-approved labeling for Abstral contains a "boxed warning" under 21 C.F.R. § 201.57(c)(1) cautioning about, among things, addiction, abuse, and life-threatening respiratory depression associated with the drug.

### PROBABLE CAUSE

22.    On six occasions between December 2018 and March 2019, agents from FDA-OCI made undercover controlled purchases of adulterated, misbranded and/or counterfeit prescription opioid drugs from a person using the moniker "killwill" on the Dream Market, a Darkweb Marketplace.

23.    Based on my training and experience, I am familiar with the methods employed by drug traffickers to use the Darkweb Marketplace, like Dream Market, to distribute controlled

substances and other illicit and illegal items.   I am aware that there are numerous large-scale narcotic distribution and virtual currency laundering networks that market their drugs on the Darkweb Marketplace using TOR[1] (The Onion Router) based websites such as "Dream Market," "Wall Street Market", and "Tochka" as well as others, to customers within the United States. These vendors provide detailed information on these sites, including: listings of their drugs for sale, methods to contact the vendor such as TOR-based e-mail or encrypted messaging applications, and price and quantity of drugs for sale in Bitcoin.  Customers purchase these goods by means of TOR-based sites using a computer.  I am aware that many vendors on these sites use the sites as an advertising base and messaging system and conduct their financial business in peer to peer transactions to avoid using third party escrow systems, Darkweb Marketplace site seizures by law enforcement, or cryptocurrency thefts, hacks, and scams.

24.    The investigation into these types of networks has resulted in the identification, arrests, and prosecutions of multiple defendants within the United States for violations involving the purchase, sale and distribution of controlled substances through Darkweb Marketplace sites - both bulk re-distributors of the controlled substances within the United States operating online as domestic vendors and traditional "street" dealers.  Within all of these variations of buying or selling controlled substances online, the constant variable is the use of Bitcoin or similar digital cryptocurrency to conduct the transactions and the requirement to exchange cryptocurrency for fiat currency and vice-a-versa.  Furthermore, individuals who purchase illegal drugs within Darkweb Marketplace marketplaces use cryptocurrency such as Bitcoin to complete the transactions.  The cryptocurrency gives the vendor and customer a perceived anonymity.

---

[1] TOR (The Onion Router) is a free, open-source internet browser which uses a volunteer network of relay servers located around the world which enables the user to remain anonymous.

However, before a customer can make a purchase on a Darkweb Marketplace, they must first convert the fiat currency, such as United States Dollars, into the cryptocurrency accepted on the marketplace.

25.     Here, in each of the six undercover purchases between December 2018 and March 2019, undercover agents ordered Oxycodone 30mg (Pressed) pills in various quantities from "killwill", a vendor on the Dream Market.  "killwill" offers various quantities of Oxycodone 30mg (Pressed) pills for sale on the Dream Market vendor page.  "killwill" offers the pills stamped with either "M" and "30" or "A" and "215".  The quantities listed for sale are from 1 to 1000 pills.  In addition, a review of information on the Dream Market vendor page for "killwill" indicates this vendor has been active on the Dream Marketplace since August 18, 2018 and has approximately 620 completed transactions as of March 13, 2019.

26.     When the parcels were delivered to the undercover agents in Kansas, the contents of the parcels purchased during the undercover operation were consistent with what was advertised for sale on the Dream Market (blue Oxycodone 30mg pills inscribed with "M" on one side and "30" on top of a line on the other side).  All of these drugs were purchased without prescriptions and were purchased over the Darkweb with Bitcoin.  Moreover, none of the drugs that were delivered to the undercover agents in Kansas had labeling bearing directions for use.

27.     Laboratory testing by the FDA's Forensic Chemistry Center was completed for five undercover purchases and revealed the purported Oxycodone 30mg (Pressed) pills to contain heroin and fentanyl.  The pills were not found to contain Oxycodone Hydrochloride.  They were compared to genuine Oxycodone 30mg and determined to be counterfeit.

28.     Each of the six undercover purchases made by FDA agents were mailed via Priority Mail Express envelopes from United States post offices in and around Amherst,

Massachusetts.  On January 28, 2019, surveillance cameras at the Amherst, MA Post Office recorded an individual mailing three Priority Mail Express envelopes.  The white male subject had a goatee and was wearing a green baseball cap printed with an eagle emblem that resembled the 101st Airborne division.

29.      On February 20, 2019, physical surveillance was established at Amherst area Post Offices by agents involved in this investigation.  At approximately 12:10pm, agents located near the Hadley, Massachusetts Post Office observed a white male entering the post office wearing a green baseball cap fitting the description of the subject seen in previously recorded surveillance video.  The subject was accompanied by a white female.  After several minutes inside the post office, agents saw the subject depart the post office driving a black Ford pickup bearing Pennsylvania license plate #ZLZ 6266.  Database checks for this license plate number revealed the truck was an Enterprise rental vehicle.  Further inquiries determined the truck was rented by STOKES.

30.      On March 7, 2019, agents involved in this investigation spoke with South Deerfield Police Detectives concerning their involvement with STOKES.  Deerfield Police Detectives explained they recently spoke with STOKES on January 25, 2019, regarding a pill press he ordered from Amazon in October 2018.  A pill press is a mechanical device used to compress powder ingredients into tablet form.  Detectives met with STOKES at 14 Conway Street in South Deerfield, Massachusetts which STOKES was using for his home remodeling business.  STOKES showed detectives the pill press sitting on the floor inside the 14 Conway Street location.  STOKES explained he bought it to make supplements with but had not used it.  Detectives told this agent the pill press appeared to be wet.

31.    On March 13, 2019, agents working this case ordered 50 Oxycodone 30mg (Pressed) pills from "killwill" on the dark web Dream Market and paid using Bitcoin.  On March 14, 2019, surveillance video at the North Amherst, MA Post Office captured a subject matching the description of STOKES enter at approximately 11:45 am.  This subject mailed parcel tracking #EE 350 049 866 US which was received at the undercover mailbox in Kansas City, Kansas being utilized for this investigation on March 15, 2019.  The parcel contained 53 small round blue pills inscribed with "M" on one side and "30" on top of a line on the other side.  These pills were consistent with the pills received from the five previous undercover purchases.

32.    In late March, 2019, the Dream Market announced it would be closing and moving to a new server.  At approximately this time, agents working this investigation could no longer locate "killwill" on the Dream Market.  "killwill" had previously listed a Wickr[2] contact of WILLKILL99 as an alternate means of communication on the "killwill" Dream Market webpage.

33.    On April 23, 2019, agents involved in this investigation communicated with WILLKILL99 on Wickr and agreed to buy 55 pressed pills in exchange for $630 worth of bitcoin.  In the hours following this Wickr communication, agents observed STOKES' cell phone ping in the area of 25 Laurel Street, Greenfield, MA[3].  Database checks show this location is occupied by Teresa Cavanna and MCLENITHAN (DOB 05/03/79).

34.    On April 24, 2019, physical surveillance was established in the area of STOKES' last known address, 223 State Road, South Deerfield, MA.  A silver Toyota 4-Runner known to

---

[2] Wickr is an American software company best known for its instant messaging application which allows users to exchange encrypted text messages which expire and disappear from the sending and receiving device.

[3] At the time, agents had a court-ordered GPS pinging order on STOKES' phone.

be driven by ABBOTT and a silver Ford F-150 known to be driven by STOKES were parked in

the driveway.  At approximately 9:50 am, the F-150 driven and occupied only by STOKES

departed 223 State Road and drove to 25 Laurel Street to pick up MCLENITHAN.  STOKES

and MCLENITHAN drove directly to 14 Conway Street, South Deerfield, MA.  STOKES and

MCLENITHAN were observed entering the warehouse at this address around 10:13am.  At

1:12pm, ABBOTT arrived driving the silver Toyota 4-Runner.  Abbott entered the warehouse

and ten minutes later, STOKES, MCLENITHAN, and ABBOTT departed 14 Conway in the F-

150.

35.     Later that same date, STOKES, MCLENITHAN, and ABBOTT arrived at

Wolfie's Restaurant in South Deerfield.  Agents followed them into the restaurant and sat at a

nearby table.  Agents then sent WILLKILL99 a Wickr message regarding the shipping

information for the 55 pills purchased April 23.  As STOKES, MCLENITHAN, and ABBOTT

were leaving the restaurant, agents saw MCLENITHAN accessing his mobile phone.  Moments

later, the agent received a reply stating he would receive a tracking number within an hour.

Agents followed STOKES, MCLENITHAN and ABBOTT as they drove to MCLENITHAN's

residence, 25 Laurel Street, Greenfield, MA and dropped him off.  Approximately 30 minutes

later, SA Cox received a message from WILLKILL99 with a tracking number showing the

parcel was mailed from the Amherst, MA Post Office at 11:47am on April 24, 2019.

36.     On April 24, 2019 at approximately 9:30pm, agents accessed the unlocked

garbage dumpster located in the parking lot next to 14 Conway Street, South Deerfield, MA.

Several garbage bags and a cardboard box were removed and transported to the South Deerfield

Police Department where they were sorted.  The cardboard box was approximately 12" x 24" in

size and one end was open.  A shipping label for STOKES, 14 Conway Street, was attached to

the bottom.  Several items were located inside the open box.  These items included several pairs of rubber gloves, 2 surgical masks, receipt for customer Teresa Cavanna, several wet napkins containing blue powder and a piece of white printer paper with a blue stain and a handwritten list printed it.  The blue color on the wet napkins and printer paper was consistent with the color of counterfeit oxycodone pills received during this investigation.  The handwritten list appeared to be ingredients for manufacturing the counterfeit pills which included "blue" "white" and "active" with the number "400" circled at the top.

37.      On April 25, 2019, the parcel ordered on April 23 was delivered to the undercover mailbox in Kansas City, Kansas.  The pills received where blue in color and similar in appearance to pills received throughout this investigation.  U.S. Postal Inspectors provided this agent with a video from the Amherst Post Office at 11:47am.  It showed a white female matching the description of Melissa Abbott mailing the Priority Mail Express Parcel.  A silver Toyota 4-Runner with Florida license plates was seen leaving the Post Office parking lot a short time later.

38.      On May 11, 2019, agents working this investigation placed an undercover purchase of 110 Oxycodone 30mg (Pressed) pills from WILLKILL99 via Wickr.  Agents paid WILLKILL99 $1000 for the pills plus $30 Priority Mail Express Shipping using an undercover bitcoin account.  On May 13, 2019 a USPS Priority Mail Express package was shipped to the undercover mailbox in Kansas City, Kansas being used for this investigation.  The parcel was shipped from the USPS location in West Chesterfield, NH 03466 at approximately 1:50pm.  On May 13, 2019, STOKES cell phone pinged within one mile of the West Chesterfield Post Office at approximately 1:20pm.  On May 15, 2019, this parcel was recovered by agents working this investigation.  It contained 110 small blue round pills tablets inscribed with "M" on one side and "30" on top of a line on the other side.

39.     On February, 2019, STOKES bailed MCLENITHAN out of jail using $50,000

cash.  MCLENITHAN was in jail following a warrant arrest for failure to appear on charges of

Assault and Battery.  MCLENITHAN's criminal history includes trafficking in cocaine (2002)

and heroin (2018).  In October 2017, a search warrant served by local law enforcement at

MCLENITHAN's residence at the time that was located in Layden, Massachusetts.  Officers

located 28 marijuana plants growing in the basement along with cocaine and heroin in other parts

of the house.  Lab tests confirmed the heroin contained noscapine and tramadol.  It should be

noted that all five undercover purchases of Pressed Oxycodone pills from "killwill" tested

positive for heroin and noscapine, among other active pharmaceutical ingredients.

40.     Information received from Comcast shows that IP Address 73.17.136.198 was

assigned to "TERESA CAVANNA, 25 LAUREL ST, GREENFIELD, MA 013013106" from

March 3, 2019 to March 9, 2019.  This agent is aware that Comcast only retains IP Address

information for 180 days.  From November 5-7, 2018, dates outside the 180 day window, orders

placed on Amazon by anthonystokes88@gmail.com  from IP Address 73.17.136.198, include

two KRUPS Coffee Grinders and three Ring Video Doorbells.  A review of

anthonystokes88@gmail.com's order history from Amazon shows a total of 8 KRUPS coffee

grinders were ordered from November 7, 2018 to March 9, 2019.  I am aware that individuals

involved in manufacturing counterfeit pills often use coffee grinders to prepare ingredients.  I am

also aware that a doorbell camera similar to the Ring Doorbell is installed near the front door at

25 Laurel Street in Greenfield, MA.  A surveillance camera similar to the Ring Spotlight Camera

is installed near the front door of 14 Conway Street, South Deerfield, MA.

41.     Records received from Coinbase[4] show STOKES' Coinbase account was accessed from IP Address 73.17.136.198 ten times beginning on November 4, 2018 and ending on March 9, 2019.  Records from Bank of America show MCLENITHAN transferred $1700 to STOKES on March 20, 2019.

42.     MCLENITHAN's friend whom he has known since childhood, Adam Conway, told Massachusetts State Police in October 2017 that MCLENITHAN is a drug dealer who is known as "The King Pin" and operates a "cash only" business.  Conway also told Massachusetts State Police that he has seen firearms inside MCLENITHAN's previous residence in Leyden, MA.  MCLENITHAN has been arrested on multiple occasions.  Some of MCLENITHAN's charges include; Unarmed Robbery (1997), Assault and Battery (2000 & 2018), Resisting Arrest (2000) and Trafficking in a Controlled substance (2002 & 2018).

43.     In May 2019, police were called to 25 Laurel Street, Greenfield, MA by Teresa Cavanna for a disturbance with MCLENITHAN.  MCLENITHAN was located inside the home, intoxicated, and was transported to the hospital via ambulance.  While inside the residence, police observed a tactical style vest, possibly a bullet proof vest, laying in plain view within the home.  MCLENITHAN is known by local police to have a history of mental health issues.  For these reasons, I request permission for a "no knock" warrant.

---

[4] Coinbase is a secure online digital currency exchange used to buy, sell, transfer and store Bitcoin and other cryptocurrencies.

### THE PREMISES CONTAINS EVIDENCE,
### FRUITS, AND INSTRUMENTALITIES

**The SUBJECT PREMISES**

44.     I have probable cause to believe that the SUBJECT PREMISES to be searched

contains fruits, evidence, and instrumentalities of violations of the federal statutes listed above,

as described in Attachment B.

45.     Public database records checks show that the SUBJECT PREMISES is occupied

by Teresa Cavanna and MCLENITHAN.  Public records do not reflect any other individuals

residing at the subject premises. When local police responded to a domestic disturbance at 25

Laurel Street in 2019, they did not identify any individuals other than Teresa Cavanna and

MCLENITHAN living at the residence.

46.     Based on my training and experience, and participation in investigations

regarding counterfeit, misbranded and unapproved prescription drugs, as well as money

laundering, I know:

a.  That suspects in matters involving counterfeit, misbranded and unapproved

prescription drugs often have pill making equipment, as well as heroin, fentanyl,

noscapine, and cutting agents.

b.  That suspects in matters involving counterfeit, misbranded and unapproved

prescription drugs, as well as money laundering, often maintain records for extended

periods of time, particularly when they are involved in ongoing criminal conduct.

Records are commonly maintained digitally, via the use of computer, cellular phone

or smart device, such as tablet computer, and those records can be stored on said

devices indefinitely. For documents delivered electronically, offenders may also be

under the mistaken belief that they deleted, hidden or further destroyed any computer-

related evidence that could be retrieved by a trained forensic computer expert. In addition, such suspects commonly retain records of the manufacture and sale of counterfeit, misbranded and unapproved prescription drugs, as well as money laundering activities, which can be stored in a variety of ways such hand kept notes, logs or other forms or memorialization.  For example, bank statements or documents from financial institutions that are commonly delivered to account holders residential addresses. In my training and experience it is common for these records to be maintained or discarded in areas were the offender initially had access to them, including, residential addresses, in vehicles or other places of operation.

c.  That suspects involved in the production and sale of counterfeit, misbranded and unapproved prescription drugs, as well as money laundering, often keep large sums of cash in their home.

d.  That suspects involved in the production and sale of counterfeit, misbranded and unapproved prescription drugs, as well as money laundering, commonly retain in books, ledgers, telephones, computers, electronic tablets such as iPads, other digital devices, and digital storage media, which reflect the names, addresses, telephone numbers, and email addresses of their associates in the fraud as well as victims of the fraud. Persons engaged in the manufacture and sale of counterfeit, misbranded and unapproved prescription drugs, as well as money laundering activities, especially when the drugs are sold over the internet, often maintain records for extended periods of time, particularly when they are involved in ongoing criminal conduct.  Records are maintained digitally, via the use of computer, cellular phone or smart device, such as tablet computer, and those records can be stored on said devices indefinitely.

e. That suspects involved in the manufacture and sale of counterfeit, misbranded and unapproved prescription drugs, as well as money laundering, commonly deposit and withdraw bulk currency, as well as transport bulk currency, and that it is common for criminal offenders to keep proceeds of their illicit activities, in the form of bulk currency, at residential addresses, in vehicles, or in other places that offer security and ready access to the property. It is common for bulk currency to be further concealed by criminal offenders in a variety of ways including the use of false or non-factory compartments in homes, as well as in safes that are more commonly found in homes.

f. That suspects involved in the manufacture and sale of counterfeit, misbranded and unapproved prescription drugs, as well as money laundering, frequently take or cause to be taken photographs of themselves, their associates, their property, and illicit proceeds. These same suspects usually maintain these photographs in their residences, electronic devices used by them, or in properties owned or rented by them.

g. That individuals involved in the manufacture and sale of counterfeit, misbranded and unapproved prescription drugs, as well as money laundering suspects who have amassed proceeds from their manufacture and sale, will often attempt to legitimize these profits. In this process suspects often utilize, among other things, banks and their attendant services, securities, cashier's checks, money drafts, wire transfers, real estate, shell corporations, business funds, and vehicles. Records evidencing such services, items, and transactions are maintained where the suspects have ready access to them, including their residences, electronic devices used by them, or in properties

owned or rented by them.  These items can remain at the fraud suspects' property for a long period of time.

    h.   That individuals involved in the manufacture and sale of counterfeit, misbranded and unapproved prescription drugs, as well as money laundering suspects, often have records regarding who ownership or possessory right to the SUBJECT PREMISES, including, but not limited to, utility bills, keys, deed or lease agreements.

    47.   Therefore, there is probable cause to believe that the SUBJECT PREMISES will contain: (a) pill making equipment used to manufacture counterfeit, misbranded and unapproved prescription drugs, as well as the drugs and agents used to manufacture those pills; (b) the records related to the purchase and sale of controlled substances; (c) bulk currency; (d) records related to the ownership of the subject premises; and (e) the electronic devices used to facilitate the manufacture and sale of counterfeit, misbranded and unapproved prescription drugs, and to launder the proceeds of those sales, and to communicate regarding the manufacture and sale of the counterfeit, misbranded and unapproved prescription drugs.

    48.   I am seeking authorization to execute "No Knock" search warrants on these premises at "any time of the day or night." This request is based on the following reasons:

    a.   The primary concern of Agents and Officers during the execution of a search warrant is the safety of all individuals involved and the preservation and recovery of any evidence.

    b.   Individuals involved in the illegal manufacture and sale of counterfeit, misbranded and unapproved prescription drugs have been known to carry weapons in the furtherance of their illicit narcotics enterprises and to protect themselves from robberies.

c.   As noted above, MCLENITHAN's childhood friend informed Massachusetts State Police that MCLENITHAN had kept firearms at his previous residence. Police have also observed a tactical style vest, possibly a bullet proof vest, laying in plain view within his current home.

d.   MCLENITHAN is known by local police to have a history of mental health issues and has a history of prior charges for a variety of criminal matters, including, but not limited to, assault and battery, and resisting arrest.

e.   Individuals involved in the illegal manufacture and sale of counterfeit, misbranded and unapproved prescription drugs commonly attempt to destroy and/or further secret the illegal prescription drugs if given advance notice of the arrival of police. Evidence in this case means individual pills, which can be easily destroyed by a variety of means, including human ingestion or flushing down the toilet and/or sink. Other items of evidentiary value common to the illegal manufacture and sale of counterfeit, misbranded and unapproved prescription drugs can also be hidden or destroyed including currency, ledgers, etc.

For these reasons, I request permission for a "No Knock" warrant.

### SEIZURE OF COMPUTER EQUIPMENT AND DATA

49.   As described above and in Attachment B, this application seeks permission to search for records that might be found at the SUBJECT PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

50.     From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.  I am also aware that the Consumer Electronics Association estimated that in 2010, 86 percent of all U.S. households owned at least one computer.

51.     From my training and experience, I am aware that personal computer systems are generally capable of creating, receiving, and otherwise processing computer files generated at or to be used at a business, such as e-mail, word-processing documents, photographs, and spreadsheets.

52.     From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in computer hardware, computer software, smartphones, and storage media.

53.     Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.  Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

54.     Based on my knowledge, training, experience, and information provided to me by

other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

    a.  Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

    b.  Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

    d.  Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are

overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

51.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computers may contain forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Target Location because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from

further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the

presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.   I know that when an individual uses a computer, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

52.   Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because of:

a.   The volume of evidence — storage media such as hard disks, flash drives, CDs, and

DVDs can store the equivalent of thousands or, in some instances, millions of pages of information.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.  Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b. Technical requirements — analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.  Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

53.     The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene.  Computer

equipment and data can be disguised, mislabeled, or used without the owners knowledge.  In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.  If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

### *UNLOCKING AN APPLE DEVICE USING TOUCH ID FEATURE*

54.     I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads, offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password.  This feature is called Touch ID.

55.     If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device.  In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

56.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours <u>and</u> the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

57.     The passcode that would unlock Apple device(s) found during the search of the SUBJECT PREMISES is not known to law enforcement.  Thus, it will likely be necessary to press the finger(s) of the user of the Apple device(s) found during the search of the SUBJECT PREMISES to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  Attempting to unlock the relevant Apple device(s) via Touch ID with the use of the fingerprints of the user is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

58.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common

area of a premises without any identifying information on the exterior of the device.  Thus, it will

likely be necessary for law enforcement to have the ability to require any occupant of the

SUBJECT PREMISES to press their finger(s) against the Touch ID sensor of the locked Apple

device(s) found during the search of the SUBJECT PREMISES in order to attempt to identify the

device's user(s) and unlock the device(s) via Touch ID.  Based on these facts and my training and

experience, it is likely that TARGET SUBJECTS are users of the Subject Device and thus that his

fingerprints are among those that are able to unlock the device via Touch ID.

59.     For these reasons, I request that the Court authorize law enforcement to press the

fingers (including thumbs) of TARGET SUBJECTS or any individuals present at the SUBJECT

PREMISES at the time the warrant is executed to the Touch ID sensor of any iPhone found at the

SUBJECT PREMISES for the purpose of attempting to unlock the device via Touch ID in order

to search the contents as authorized by this warrant.

## CONCLUSION

1.     Based on the information described above, I have probable cause to believe that

STOKES, MCLENITHAN, and ABBOTT have violated 21 U.S.C. §§  331(a) (distribution of

adulterated and misbranded drugs), 331(i)(2) (possessing a thing to render a drug a counterfeit

drug),  331(i)(3) (distribution of counterfeit drugs), 841(a)(1) (distribution and possession with

intent to distribute a controlled substance), 841(h)(1)(A) (dispensing controlled substance via the

Internet), 843(b) (unlawful use of a communication facility (including the mails) to facilitate the

distribution of a controlled substance), 846 (conspiracy to distribute a controlled substance), and

18 U.S.C. § 1956 (money laundering).

2.     Based on the information described above, I also have probable cause to believe

that fruits, instrumentalities, and evidence of these crimes, as described in Attachment B, will be

found within the SUBJECT PREMISES described in Attachment A.

Sworn to under the pains and penalties of perjury,

Joseph McCulley
Special Agent, FDA-OCI

Sworn and subscribed to before me
this _10th_ day of June 2019.

KATHERINE A. ROBERTSON
United States Magistrate Judge

32

**ATTACHMENT A**

<u>Description of Premises to be Searched</u>

25 Laurel Street, Greenfield, MA 01301 ("SUBJECT PREMISES") including any vehicles parked in the driveway or street directly in front of the SUBJECT PREMISES. This also includes any area or structure located within the property line of the SUBJECT PREMISES. The SUBJECT PREMISES is a two story tan house. According to property records, the home is listed as a duplex which is owned by Teresa J. Cavanna.



## ATTACHMENT B

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 331(a) (distribution of adulterated and misbranded drugs), 331(i)(2) (possessing a thing to render a drug a counterfeit drug),  331(i)(3) (distribution of counterfeit drugs), 841(a)(1) (distribution and possession with intent to distribute a controlled substance), 841(h)(1)(A) (dispensing controlled substance via the Internet), 843(b) (unlawful use of a communication facility (including the mails) to facilitate the distribution of a controlled substance), 846 (conspiracy to distribute a controlled substance), and Title 18, United States Code, Section 1956 (money laundering) namely:

    1.   All pills marked with M/30 or A/215 and pill making equipment, including pill presses, dies, molds, binding agents, capsules, colors, gloves, masks, recipes and drying equipment

    2.   Heroin, fentanyl, noscapine, and cutting agents

    3.   All records and information, in whatever form they may be found, related to the purchase and sale and manufacture of controlled substances, including, but not limited to; Postal Records, Postal Envelopes, Shipping documents, sales and payment records, documents related to Post Office Boxes or Storage facilities, sales and payment ledgers, cryptocurrency ledgers.

    4.   All records and information, in whatever form they may be found, related to the use and establishment of the online moniker or Wickr handle "killwill", WILLKILL99, WILLKILL66 or KILLWILL20.

5.  All records and information showing ownership or possessory right to the SUBJECT PREMISES, including, but not limited to, utility bills, keys, deed or lease agreements.

6.  Cash and Digital Currency, such as bitcoin, cryptocurrency (or digital currency) private keys, and digital currency recovery seeds.

7.  Computers or storage media used as a means to commit the violations described above, including the online sale of controlled substances, misbranded drugs, altered drugs, and/or counterfeit drugs.

8.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

    m. contextual information necessary to understand the evidence described in this attachment.

9.      Routers, modems, and network equipment used to connect computers to the Internet.

10.    Storage units and containers, such as floor safes, wall safes, upright safes (also known as gun safes), lock boxes, and other self-contained locked enclosures.

## DEFINITIONS

For the purposes of this warrant:

    a. The terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

    b. The term "computer" or "computer equipment" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

    c. The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

d. With respect to any cryptocurrencies to be seized, such as bitcoin, cryptocurrency private keys and recovery seeds (as described above in paragraph 1(g)), the cryptocurrency (or digital currency), cryptocurrency (or digital currency) private keys, and recovery seeds to be seized is evidence, contraband, involved in or traceable to violations of 18 U.S.C. § 1956 (Money Laundering) and/or violations of 21 U.S.C. §§ 841(a)(1) (Manufacturing, Distribution of, and Possession with Intent to Distribute, a Controlled Substance), 843(b) (Unlawful Use of a Communication Facility (including the mails) to facilitate the Distribution of a Controlled Substance), 846 (Attempt and Conspiracy to Commit Controlled Substance Offense). Seizure of any cryptocurrency/digital currency private keys and recovery seeds shall also be construed to include seizure of any cryptocurrency related to any such seized private keys and/or recovery seeds, and such seizure shall allow transfer of any such related cryptocurrency to one or more government controlled accounts, or "wallets."

## RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below. If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

38

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes